IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PROCLIP USA, LLC and BRODIT, AB,

                        Plaintiffs,                          OPINION AND ORDER

        v.                                                   21-cv-163-wmc

STEVEN D. EBERT and A-TACH
MOUNTS, LLC,

                        Defendants.

---

Plaintiffs ProClip USA, LLC, and Brodit AB filed this lawsuit against Steven D. Ebert and A-Tach Mounts, claiming violations under the Wisconsin Uniform Trade Secrets Act, as well as various common law claims. Before the court is defendants' motion to dismiss the complaint for failure to state a claim. (Dkt. #25.) For the reasons stated below, the court will deny that motion.[1]

ALLEGATIONS OF FACT[2]

A. Parties

Brodit is a Swedish company and a manufacturer and distributor of various accessories for consumer electronics, including vehicle mounts for phones and other electronics called "ProClip" mounts. ProClip purchases, imports and distributes ProClip mounts and other products by Brodit and sells them throughout North America. Ebert is

---

[1] For purposes of defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] as true all of the well-pleaded facts in the complaint and draw[s] all reasonable inferences in favor of" plaintiff. *Jakupovic v. Curran*, 850 F.3d 898, 902 (7th Cir. 2017) (internal citation omitted).

[2] This action was removed based on 28 U.S.C. §§1332, as all parties are diverse and the amount in controversy exceeds $75,000. (Not. of Removal (dkt. #1) 2.)

a former employee of ProClip USA.  He is also the founder and sole owner of A-Tach, which also sells vehicle mounts for consumer electronics.

### B.  ProClip mounts and the processes by which they are made

Generally speaking, there are two components to a ProClip mount: (1) the vehicle mount, which is specifically developed and designed to fit a particular make, model, and year of vehicle; and (2) the device-holder, which is designed to accommodate a specific type of electronic device.  The present dispute is primarily focused on the vehicle mount component.  ProClip and Brodit typically work together to develop a new vehicle mount in the following manner: (1) ProClip identifies a new make and model of vehicle that is on the market in the United States; (2) ProClip arranges to have in-person access to the new vehicle (for example, at a car dealership), and physically creates a prototype for a new vehicle mount while on location; (3) ProClip sends the prototype to Brodit in Sweden; (4) Brodit uses the prototype to manufacture a new ProClip vehicle mount using the "Brodit Process" (described below); (5) Brodit sends production samples of the new mount back to ProClip in the U.S. for final testing; and (6) assuming the mount passes testing and inspections, Brodit begins mass production.

According to plaintiffs, the Brodit Process was originally developed by Brodit in the 1980s for creating mounts suitable for meters and cell phones in taxis, as well as two-way radios, and involves a unique and difficult system that produces "custom-made mounting solutions for specific vehicle makes and models."  (First Am. Compl. (dkt. #28) ¶¶ 12-15, 24.)  Plaintiffs further allege that "there are two actions that fall under the definition of the Brodit Process: (a) the first is the design process, [which] refers to the steps required

2

to design and create a physical prototype for a new vehicle mount; and (b) the second is the manufacturing process, [which] refers to the steps to use the prototype and actually manufacture the final consumer product." (*Id*. at ¶ 17.) This process allegedly enables plaintiffs to create these customized mounts "without investing in expensive tools and other equipment and with shorter lead times to develop and manufacture new products. (*Id*. at ¶ 23.)

According to plaintiffs, the Brodit Process is difficult for a new individual to learn and master, and typically requires in-person training. (*Id*. at ¶ 26.) Moreover, Brodit is careful to keep the process confidential and has entrusted only a small, select group of people, including defendant Ebert, with knowledge of the process. Indeed, plaintiffs represent that before Ebert was trained in the "Brodit Process," the only other ProClip employee who had learned the process was Bjorn Spilling, ProClip's President and CEO. (*Id*. at ¶ 30.)

## C. Ebert's employment at ProClip USA

In 2006, Ebert was hired to work for ProClip in Madison, Wisconsin, as a Sales Representative. His employment ended in 2008, but then restarted again in 2011. According to plaintiffs, Ebert was rehired as a "Vehicle Mount Specialist," while defendants assert that Ebert's job title was "Customer Support" from 2011 until his employment

ended in 2021.[3]  In 2016, Ebert relocated to Clarkston, Washington, where he continued to work for ProClip USA remotely, but with reduced.

According to plaintiffs, Ebert was a valuable and highly trusted employee, and was given more responsibilities and access to sensitive ProClip information than traditional employees.  In particular, plaintiffs allege that Ebert had access to:  (1) ProClip's pricing; (2) ProClip's manufacturing techniques and methods; (3) the identify and contact information of ProClip's current and anticipated vendors and suppliers; (4) the identity and contact information of ProClip's current and prospective customers; and (5) vehicle mount plans, prototypes, and design drawings.  Further, in 2011 or 2012, ProClip and Brodit management approved Ebert to become trained in the Brodit Process.  In 2013, certain Brodit personnel, including Fredrik Källström, visited the ProClip facility in Madison, Wisconsin.  As a part of that visit, Källström began to train Ebert in the "Brodit Process."  Later, Ebert also visited Brodit's facility in Sweden, during which plaintiffs claim that Ebert learned more about the "Brodit Process."  Ebert allegedly was well aware of the confidential nature of all of this training and education, including being specifically informed by ProClip's President Spilling "early on" that "Brodit did not want anyone to

---

[3] Plaintiffs assert that, while he was an employee at ProClip, Ebert received a copy of the ProClip USA Handbook.  Spilling represents that the Handbook has an effective date of December 2, 2013, and has provisions regarding confidential information, employee use of company assets, and conflicts of interest.  However, plaintiffs have not actually produced a copy of the Handbook.  Moreover, Ebert avers that while he received a handbook when he was first hired in 2006, he never signed, saw, or agree to be bound by any handbook when he was rehired in 2011.  Regardless, plaintiffs do not bring any claims relying on the provisions of the Handbook, so it does not appear material to the parties' present dispute.

see the process of making the [ProClip] mounts and that the Brodit Process was confidential." (First Am. Compl. (dkt. #28) ¶ 55.)

As part of his job, Ebert would also visit Madison-area car dealerships to inspect new vehicles, as well as design and create new vehicle mounts. The mount prototypes that Ebert made would eventually become products manufactured by Brodit for ProClip. After he moved to Clarkston, Washington, Ebert continued this same work, including visiting local dealerships to create prototypes to be sent to ProClip. ProClip provided Ebert with a work van to use to visit car dealerships in the Clarkston area, as well as to continue to physically design and create prototypes for new vehicle mounts using the "Brodit Process" to design and make new prototypes.[4]

At some point in March of 2020, and without ProClip's knowledge, Ebert formed A-Tach Mounts, LLC, and registered the A-Tach mark. Even before formally registering, Ebert began using a new van that displayed A-Tach brand and logo. A-Tach also began advertising vehicle mounts on its Instagram account as early as October 2019. Plaintiffs claim that between March of 2020 and January of 2021, Ebert similarly approached several social media influencers that promote and review products for ProClip.[5] Plaintiffs further assert that beginning in early 2020, Ebert substantially delayed or failed to send various

---

[4] Defendants dispute this, contending that Ebert used his own background and skills to make the prototypes both before and after the move to Clarkston. However, as previously noted, the court must accept plaintiffs' allegations as is in deciding defendants' motion to dismiss.

[5] Again, defendants dispute this. In particular, Ebert represents that he does not even know what influencers have a relationship with ProClip *and* that he has not approached any influencers. At the same time, Ebert concedes that he *has* been contacted by a few product reviewers, who have asked to review A-Tach products for their social media outlets. While perhaps this, too, might be addressed at summary judgment, the court will not go outside the pleadings at this point.

prototypes to ProClip.  In particular, plaintiffs list in their First Amended Complaint some eighteen specific vehicle makes and models, the prototypes of which were requested, but Ebert allegedly either delayed or never sent.  Plaintiffs similarly allege mounts for these new vehicles are now available for sale on the A-Tach website.  As an example, plaintiffs claim they never received a mount prototype for the 2021 Escalade, but that Ebert made and sold a mount for that same vehicle through A-Tach.

Worse, plaintiffs claim that there are numerous prototypes and vehicle mounts that Ebert *had* turned over to ProClip, but that Ebert also created complete or partial copies of those mounts and retained them, ultimately using them to create mounts for A-Tach.  Specifically, plaintiffs have attached to the First Amended Complaint an exhibit, which identifies over 200 mounts that they allege Ebert copied in full or in part, then sold through A-Tach in competition with ProClip.  Plaintiffs further claim that Ebert designed and manufactured the mounts using the "Brodit Process," while he was a ProClip employee and using ProClip resources, materials, and confidential information.  Defendants object that the mounts could not be unlawfully "copied" as there is no copyright or patent over them.  Regardless, defendants assert that the mounts were made with Ebert's own skill, materials, and tools, and on his own time.

Brodit first learned about the existence of A-Tach mounts through Brodit's reseller in Qatar.  The reseller had come across A-Tach's website listing a mount for the 2020 Defender, and emailed Brodit about it.  Brodit then notified ProClip about A-Tach on January 22, 2021.  Three days later, January 25, 2021, Ebert formally presented ProClip with his two weeks' notice of resignation.

OPINION

A motion to dismiss for failure to state a claim is designed to test the complaint's legal sufficiency. *See* Fed. R. Civ. P. 12(b)(6). The court must "constru[e] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [the plaintiff's] favor." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009). Dismissal is warranted only if no recourse could be granted under any set of facts consistent with the allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007). To survive a motion to dismiss, a plaintiff must allege sufficient facts to state a plausible claim for relief. *Spierer v. Rossman*, 798 F.3d 502, 510 (7th Cir. 2015) (citing *Twombly*, 550 U.S. at 570). "[W]hen it is 'clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law,' dismissal is appropriate." *Parungao v. Cmty. Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017) (quoting *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)).

Under this relatively permissive standard, therefore, plaintiffs simply need to allege enough facts to support their claim. In their briefing, defendants provided many well-reasoned arguments that are nevertheless not ripe in consideration of a motion to dismiss. In particular, a court must accept the facts as pleaded at this stage, preventing it from deciding alleged breaches of copyright protection, non-disclosure agreements, or efforts at concealment where material disputes of fact exist or the proper application of mixed questions of fact and law remain unsettled.

## I.  Trade Secret Misappropriation

The Wisconsin Uniform Trade Secrets Act, Wis. Stat. § 134.90 protects against the misappropriation of trade secrets.  The Act defines a "trade secret" as:

> a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:
> 1. The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> 2. The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

Wis. Stat. § 134.90(1)(c).

In other words, "to show that particular information is a trade secret, a [plaintiff] must demonstrate that it is valuable, not known to others who might profit by its use, and has been handled by means reasonably designed to maintain secrecy." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002).  Eventually, to prevail on a WUTSA claim, a plaintiff must "do more than just identify a kind of technology and invite the court to hunt through the details in search of items meeting the statutory definition," but the standard at the motion-to-dismiss stage is decidedly less exacting.  (*Id.* at 584.)  Additionally, at this point in the litigation, the court must draw all inferences in the plaintiff's favor.  *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009).

Here, plaintiffs allege that the "Brodit Process" *is* a trade secret and was unlawfully misappropriated by defendants.  They further explain that the "Brodit Process" involves two, unique steps:  the design process, which they describe only as "the steps required to design and create a physical prototype for a new vehicle mount"; and the manufacturing process, which "refers to the steps to use the prototype and actually manufacture the final

8

consumer product." (Pls.' PFOFs (dkt. #24) ¶ 7.) While these claims may be vague, they are sufficient to survive dismissal.

Whether, after discovery, the claim will survive a motion for summary judgment is another matter entirely. Accepting all the facts in the pleading as true, however, ProClip has sufficiently alleged control over a process of economic value that the company has kept secret. Wis. Stat. § 134.90(1)(c).

## II. Preemption under WUTSA

Defendant next argues that all of ProClip's common law claims are preempted by the Wisconsin Uniform Trade Secrets Act, Wis. Stat. § 134.90 ("WUTSA"). Such a sweeping interpretation of § 134.90 is unsupported. In fairness, subsection 6(a) does state that "[e]xcept as provided in par. (b), this section displaces conflicting tort law, restitutionary law and any other law of this state providing a civil remedy for misappropriation of a trade secret." *Id*. However, after reading 6(b), this stated preemption only applies to "[a]ny civil remedy … based upon misappropriation of a trade secret." Wis. Stat. § 134.90(6)(b)(2). Even so, defendant would read the "based upon" language very broadly, arguing that § 134.90 still preempts all claims having *any* connection to an alleged trade secret, even if only tangentially, and therefore, all of plaintiff's claims depend on the existence and misappropriation of the Brodit process. (Def.'s Mot. (dkt #33) 16.) In contrast, plaintiffs argue that their claims are not just based on the Brodit Process, and thus, are not "based upon misappropriation of a trade secret," no matter how broadly one applies the phrase "based on." Wis. Stat. § 134.90(6)(b)(2). Regardless, at this stage, the court need not resolve this dispute.

9

Rather, at the pleading stage, what is crucial is the uncertainty as to whether the Brodit Process truly counts as a trade secret, leaving civil remedies outside of WUTSA available for now.  In particular, as the Wisconsin Supreme Court has explained,

> Wis. Stat. § 134.90(6)(a) and (b) 2, taken together, are meant to do the following: (1) replace all pre-existing definitions of "trade secret" and remedies for tort claims dependent solely on the existence of a specific class of information statutorily defined as "trade secrets"; and (2) leave available all other types of civil actions that do not depend on information that meets the statutory definition of a "trade secret."

*Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶ 33, 294 Wis. 2d 274, 298, 717 N.W.2d 781, 793.

Thus, under Wisconsin law, "any civil tort claim not grounded in a trade secret, *as defined in the statute*, remains available to [plaintiff]."  *Id.* (emphasis in original).  While ProClip has sufficiently pleaded facts that might support finding a trade secret, that may also change at a later stage of this lawsuit, particularly after discovery.  As such, the court will not decide definitively on the pleadings alone whether plaintiffs' other claims are preempted.  Of course, if ProClip is allowed to go forward with the WUTSA claim after discovery, all of their non-WUTSA claims may be preempted, but even that remains to be seen.  Similarly, if ProClip's claim of a trade secret ultimately fails, its non-WUTSA claims may be ProClip's only chance to prevail.  As such, the court will reserve on the question of preemption at the pleading stage.

### III. Unfair Competition

Plaintiffs next claim that Ebert's actions violate common law unfair competition based on misappropriation. To establish this claim, "Wisconsin courts have stated that a plaintiff must prove three elements: '(1) time, labor, and money expended in the creation of the thing misappropriated; (2) competition; and (3) commercial damage to the plaintiff.'" *Thermal Design, Inc. v. American Soc'y of Heating, Refrigerating & Air-Conditioning Eng'rs, Inc.*, No. 07-C-765, 2008 WL 1902010 at *8 (E.D. Wisc. April 25, 2008) (citing *1974 Mercury Record Productions*, 64 Wis.2d at 174, 218 N.W.2d at 709.) Plaintiffs have more than sufficiently pleaded all three elements in their First Amended Complaint, allowing that claim to survive the motion to dismiss as well.

Defendant further argues that ProClip has failed to plead unfair competition as "there is nothing 'unfair' about [Ebert] using [his] experience elsewhere." (Def.'s Mot. (dkt #33) 19.) This argument mainly hinges on the first prong of time, labor, and money spent on a thing misappropriated. While ProClip alleges that Ebert used the Brodit process to start his business, defendants argue that Ebert simply used his own knowledge and expertise. *Id*. This argument would be more compelling if ProClip were only alleging that Ebert learned skills during his employment, such as the Brodit Process, which he then used to compete with ProClip. *See Gary Van Zeeland Talent, Inc. v. Sandas*, 84 Wis. 2d 202, 214, 267 N.W.2d 242, 248 (1978) (holding that the law, "encourages the mobility of workers; and so long as a departing employee takes with him no more than his experience and intellectual development that has ensued while being trained by another . . . the law affords no recourse.")

However, ProClip also alleges that Ebert (1) took designs he was supposed to make for ProClip to sell on his own, (2) turned in knowingly inferior prototypes to ProClip in return, and (3) used company time and resources to start A-Tach Mounts while he was still employed by ProClip.  (Pl.'s Opp. (dkt. #34) 9-10.)  Given that Ebert was allegedly being paid to create prototypes for ProClip, while at the same time, using company time and information to create his own mounts and knowingly sending inferior products to ProClip during his employment, a misappropriation of ProClip's time, labor, and money could very well have occurred.  At this juncture, the court must take all well-pled facts as true.  *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009).   Under this standard, ProClip has sufficiently pled unfair competition.

## IV. Breach of Loyalty

Defendants further argue that Ebert was never a key employee, and thus, never owed any duty of loyalty to ProClip, warranting dismissal of this claim.  Under Wisconsin law, an employee must be a "key employee" in order to find that a duty of loyalty existed.  *Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶ 42, 294 Wis. 2d 274, 304, 717 N.W.2d 781, 796 (citing *Aon Risk Servs., Inc. v. Liebenstein*, 2006 WI App 4 ¶ 26, 289 Wis. 2d 127, 710 N.W.2d 175.)  Citing as support *Modern Materials, Inc. v. Advanced Tooling Specialists, Inc.*, 206 Wis. 2d 435, 442, 557 N.W.2d 835 (Wis. App. 1996), defendants assert that such an employee must be a "corporate officer or director," of which Ebert is neither.  (Def.'s Mot. (dkt #33) 22.)

The problem with defendants' position is that while corporate officers and directors are the employees *most* likely to owe a duty of loyalty, neither *Modern Materials* nor any

other Wisconsin precedent hold that they are the *only* types of employees with a duty. *InfoCorp, LLC v. Hunt*, 2010 WI App 3, ¶ 16, 323 Wis. 2d 45, 54, 780 N.W.2d 178, 182. To the contrary, the Wisconsin Court of Appeals has specifically analyzed "the duty of loyalty owed by an employee who is not an officer or director, and does not have equivalent policy making authority." (*Id.*)  That court concluded under Wisconsin law that "for an employee who is not an officer or director, the status of "key employee" is determined by the specific job responsibilities and the harm to the employer resulting from misuse of those responsibilities." (*Id.* at ¶ 31.)  More specifically, the court explained that the Wisconsin Supreme Court has already "upheld a finding that the employee who is not an officer or director breached a duty of loyalty by taking actions within the scope of the employee's responsibilities that were directly contrary to the employer's interest." (*Id.* at ¶ 17.)

Here, plaintiffs allege that Ebert "was a valuable and highly trusted employee, and was given increasingly greater responsibilities and access to sensitive ProClip USA information." (Am. Compl. (dkt. #28) 8.)  Among other important and confidential matters, Ebert was allegedly responsible for monitoring all new cars coming to market and making prototypes to fit those cars. (*Id.* at 10.)  Allegedly, this job came with great responsibility over the creation of new core products for ProClip.  Despite this responsibility, plaintiffs further allege that Ebert failed to submit designs for mounts he planned to sell, or he submitted inferior prototypes of those mounts, while reserving better mounts for sale through A-Tach. (*Id.* at 12-17.)  These allegations are enough for a reasonable trier of fact to infer that Ebert "[took] actions within the scope of [his]

13

responsibilities that were directly contrary to [his] employer's interest." *InfoCorp LLC*, 2010 WI App 3 at ¶ 16. For that reason, the court will not dismiss ProClip's claim for breach of loyalty.

## V. Unjust Enrichment

Finally, defendant argues that because none of the ProClip mounts were protected by intellectual property law, ProClip cannot claim unjust enrichment from defendant's alleged copying. (Def.'s Rep. (dkt. #35) 27.) The court need not even address this argument as ProClip has sufficiently pleaded the elements of unjust enrichment, which stands independently and apart from any claim that Ebert copied ProClip's designs. Under Wisconsin law, a claim of unjust enrichment must involve: "(1) a benefit conferred on the defendant by the plaintiff, (2) appreciation or knowledge by the defendant of the benefit, and (3) acceptance or retention of the benefit by the defendant under circumstances making it inequitable for the defendant to retain the benefit." *Watts v. Watts*, 137 Wis. 2d 506, 531, 405 N.W.2d 303, 313 (1987). As noted before, ProClip alleges that Ebert was retaining prototypes, submitting substandard prototypes, and generally advancing A-Tach Mounts while still employed by ProClip. If taken as true, the allegations show that Ebert was drawing a salary from ProClip while using work time and resources to create a competing business.

Whether or not ProClip's designs were copyrighted under federal law, therefore, is not likely to be dispositive with respect to allegations that Ebert was being functionally paid by ProClip to create a direct competitor to its own business. Rather, a reasonable trier of fact might well find these facts meet the criteria for unjust enrichment under

14

Wisconsin law.  Regardless, when exactly Ebert started A-Tach mounts, and the extent to which that overlapped with his employment with ProClip, appears to be yet another disputed issue of material fact.  At a later date, the parties will have to present actual evidence relevant to those factual disputes; however, ProClip has at this stage pleaded enough facts to have stated a plausible claim of unjust enrichment.

## ORDER

IT IS ORDERED that defendants Steven Ebert and A-Tach Mounts' motion to dismiss (dkt. #32) is DENIED.

Entered this 25th day of February, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge